OPINION
Defendant-appellant, Timothy J. Conley, appeals from a judgment of the Franklin County Court of Common Pleas, finding him guilty of aggravated murder in violation of R.C. 2903.01, and illegal possession of a firearm in liquor permit premises in violation of R.C. 2923.121, both with specifications.
On July 30, 1997, Deborah Stamm, co-owner of Breezer's Bar, was found murdered in the men's bathroom of the bar. Following defendant's admitting to his nephew, Officer Ted Stacy, that he had committed the murder, defendant was indicted on aggravated murder charge with specifications, illegal possession of a firearm in liquor permit premises with specifications, and tampering with evidence and obstruction of justice. A jury trial resulted in a verdict finding defendant guilty of aggravated murder and illegal possession of a firearm in liquor permit premises, with the respective specifications. The trial court sentenced defendant accordingly. Defendant appeals, assigning the following errors:
FIRST ASSIGNMENT OF ERROR:
 APPELLANT'S AGGRAVATED MURDER CONVICTION IS NOT SUPPORTED BY THE EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. THE STATE FAILED TO PROVE (1) THAT HE WAS THE PERSON RESPONSIBLE FOR THE DEATH OF THE VICTIM, AND (2) THAT WHOEVER CAUSED THE VICTIM'S DEATH DID SO WITH PRIOR CALCULATION AND DESIGN.
SECOND ASSIGNMENT OF ERROR:
 APPELLANT'S CONVICTION FOR ILLEGAL POSSESSION OF A FIREARM IN LIQUOR PERMIT PREMISES IS NOT SUPPORTED BY THE EVIDENCE.
Defendant's first assignment of error asserts his aggravated murder conviction is not supported by the evidence and is against the manifest weight of the evidence. Specifically, defendant contends the state failed to prove (1) he was the person responsible for the death of the victim, and (2) whoever caused the victim's death did so with prior calculation and design.
To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported.
When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380
("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence").Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230.
According to the undisputed evidence, Deborah Stamm and her husband, Chuck Stamm, owned Breezer's bar. On July 30, 1997, Joy Fisher and her boyfriend, Dane Harness, went to Breezer's bar where Joy was employed. On arriving, they unexpectedly found the bar locked. Chuck Stamm arrived soon after them, and unlocked the door. As Fisher entered the bar, she observed a cold, opened beer bottle on the bar. Fisher and Chuck Stamm searched the bar for Deborah Stamm; Fisher found her dead in the men's restroom.
The remaining facts are largely disputed. According to defendant, on July 30, 1997, defendant drove a car borrowed from his stepdaughter to meet his brother, Jeff Conley, at Jeff's home. Because Jeff was not home, defendant went to Ricky Hupp's house, where Hupp asked defendant to take him to Breezer's bar. The two arrived at the bar at 10:45 a.m., Hupp got out of the car, knocked on the front door, and was admitted. Defendant subsequently entered the bar, and sipped a beer while he waited for Hupp.
As he waited, he heard Hupp arguing with the victim in the rear of the bar. Defendant then heard what sounded like a gun shot, muffled by the sound of music from the jukebox. When defendant proceeded to the back of the bar to see what had happened, he found Hupp standing between the threshold and the door with a gun in his hands, and the victim lying on the floor. According to defendant, Hupp issued what defendant understood to be a death threat for defendant's wife and children, if defendant said anything about the matter. Defendant then left Hupp at the bar, went to his parents' house and then returned the car to his stepdaughter. He was subsequently dropped off at his brother's home. Again, Jeff was not home, so he walked to Hupp's house to ask for a ride home.
Defendant testified Hupp continued to threaten him. On November 11, 1997, Hupp contacted him and told defendant to contact the police to inform them defendant had committed the crime. Hupp told defendant to say what gun was used, where the victim was shot, and that it was an accident. Defendant in fact contacted his nephew, Ted Stacy, a Columbus police officer, to confess to the murder.
The state's case rested primarily on the testimony of Hupp, who, by contrast, testified defendant admitted to committing the murder. Specifically, defendant came to Hupp's home and asked Hupp to turn on the television to watch the news. Because the news was completed, defendant instead told Hupp defendant had made the news. When Hupp inquired why, defendant replied, "I shot someone." (Tr. Vol. III, 49.) Defendant told Hupp he shot "a bar bitch * * * [b]ecause she called me a bastard." (Id.)
Defendant further explained to Hupp how he accomplished the murder. He said he told the victim the water in the men's bathroom was running over and would not stop. As Deborah Stamm walked into the men's bathroom, defendant followed her in, pulled out a gun, put it to the back of her head, and shot her. When Hupp asked if she was dead, defendant replied, "yes * * * I nudged her and she gurgled." (Tr. Vol. III, 50.) Defendant picked up the shell casing, locked up the bar, turned up the jukebox, and left.
The testimony of both defendant and Hupp in effect was corroborated by defendant's nephew, Ted Stacy. Stacy testified that on November 13, 1997, defendant telephoned him and stated that he was the one who "shot the barmaid at Breezer's." (Tr. Vol. III, 9.) Defendant told Stacy it was an accident, but Stacy knew defendant was serious by the concerned tone in his voice. Stacy told defendant "you got to give me more than that * * * and at that point in time he said that he had used a .380 * * * I asked him about the gun, and he said he got rid of it." (Tr. Vol. III, 10.) When Stacy was asked what motivated defendant to contact Stacy regarding the murder, Stacy replied, "Tim was having problems dealing with the guilt." (Tr. Vol. III, 18.) Stacy subsequently reported the incident to his supervisor, who in turn, contacted the investigating officer with the information.
Testimony regarding the murder weapon was also disputed. Hupp testified that a few days before the murder defendant came to Hupp's home inquiring whether Hupp could obtain a handgun for defendant; defendant stated that he was going to use the gun for target practice. Hupp purchased a .380 from Bob Wilson for $175, and intended to sell it to defendant for $200. After Hupp had purchased the gun, defendant could not come up with the $200, so defendant instead proposed that Hupp take defendant's car as a trade; Hupp agreed. Defendant, by contrast, denied he obtained a gun from Hupp in exchange for a car, and instead, maintained he saw Hupp in possession of a gun. Moreover, defendant testified he sold Hupp a car sometime around July 20 in exchange for $600 cash.
Detective Joseph Huntzinger of the Whitehall Police Department testified that a gun was retrieved from a pond in Pickerington, on December 1, 1997. Defendant's brother directed the police to the location where the gun was found. No latent fingerprints were found on the gun.
Given that evidence, defendant contends the state failed to prove by sufficient evidence, or by the manifest weight of the evidence, the "prior calculation and design" element of the charged offense.
"[I]t is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of `prior calculation and design.'" State v. Taylor (1997), 78 Ohio St.3d 15,20. "There is no single set of factors to be mechanically applied when determining whether prior calculation and design is present. `[E]ach case turns on the particular facts and evidence presented at trial.'" State v. Goodwin (1999),84 Ohio St.3d 331, 344, quoting Taylor, supra, at 20. "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." State v. Cotton (1978), 56 Ohio St.2d 8, paragraph three of the syllabus.
Viewed in a light most favorable to the prosecution, the evidence revealed defendant occasionally went to Breezer's and was at least familiar with the victim. On the day of the murder, defendant, having obtained a gun, told the victim as a pretense that the water in the men's bathroom was running over. He followed the victim as she proceeded to the men's bathroom and there shot her in the back of the head. He then picked up a shell casing, locked the front door, and exited through the back door. The evidence thus indicates defendant not only planned the method, manner, and place of the killing, but had sufficient time to formulate the plan and carry it out. The state was not required to prove defendant planned to murder the victim, days, weeks, or even hours prior to the killing. See State v. Robbins (1979), 58 Ohio St.2d 74
(finding prior calculation and design where defendant argued with the victim, assaulted the victim, retrieved a sword and then stabbed the victim to death because defendant had sufficient time to formulate a plan and carry it out). See, also,Taylor, supra (finding sufficient evidence of prior calculation and design despite only two to three minutes between the instigating incident and the shooting). Goodwin, supra.
Construed most favorably to the prosecution, the evidence thus is sufficient to allow reasonable minds to find prior calculation and design. Similarly, defendant's contention that the finding of prior calculation and design is against the manifest weight of the evidence is unpersuasive. Hupp presented the only evidence of prior calculation of design; defendant instead contended Hupp, not he, committed the murder. As a result, the state's evidence regarding prior calculation and design was unchallenged, and the jury's verdict in that regard is not against the manifest weight of the evidence.
Defendant also contends the verdict finding him guilty of aggravated murder is unsupported by sufficient evidence and is against the manifest weight of the evidence. Specifically, defendant contends that the state did not prove beyond a reasonable doubt that defendant, not Hupp, committed the murder. When the evidence is construed in the state's favor, however, Hupp's testimony is sufficient to support the jury's verdict.
Defendant's weight of the evidence argument largely is premised on the contradictory testimony of Hupp and defendant. While several other factors ostensibly lend support to the state's case, defendant offered explanations. For example, Stacy testified defendant confessed to murdering the victim, but defendant testified he did so under Hupp's threat of mortal harm to defendant's family. Defendant's DNA matched samples taken from an opened, chilled beer bottle found at the bar, but defendant testified he sipped the beer while, unbeknownst to defendant, Hupp killed Stamm. The state introduced letters expressing defendant's despair subsequent to the murder, presumably over his murdering the victim, but defendant said his despondency arose from personal and financial problems.
As a result, the jury was forced to determine whose testimony was more credible. See State v. Mayhew (Mar. 30, 1993), Franklin App. No. 92AP-1375, unreported. In Mayhew, defendant's conviction depended solely on the credibility of the witnesses, as there was no physical evidence linking defendant to the crime. This court held that the victim's uncorroborated testimony was enough to find defendant guilty beyond a reasonable doubt, notwithstanding contrary testimony from defendant and two defense witnesses. Because the jury here could find Hupp credible, and not find defendant credible, the jury's verdict is not against the manifest weight of the evidence. Defendant's first assignment of error is overruled.
Defendant's second assignment of error asserts the state failed to prove he possessed a firearm in liquor permit premises because the evidence is insufficient to show defendant, not Hupp, possessed the weapon at issue. As noted, because the jury could find Hupp's testimony credible, his testimony supports defendant's conviction by allowing the jury to find defendant lured the victim into the men's restroom and subsequently shot the victim in the head with a firearm.Defendant's second assignment of error is overruled.
Having overruled both of defendant's assigned errors, we affirm the judgment of the trial court.
LAZARUS and KENNEDY, JJ., concur.